All right, call up the third case, Universal Truckload v. Dalton. Mr. Novak? Mr. Novak? May it please the Court, and good morning. My name is Scott Novak. I'm here representing Universal Trucking, Inc. in the present appeal. We have multiple appellate issues today. In the bulk of my speaking time, we are also appealing the reallocation of $1.9 million awarded to Universal by the jury for money had and received that was held by Dalton and not excused by the jury. In addition, we are appealing the jury verdict on the H&P claim. That was a claim by Universal against H&P for effectively breach of contract associated with bills of lading, for the carriage of goods in interstate commerce, as well as the attendant summary judgment granted by the lower court for some loads that were subcontracted by Universal for H&P's behalf. We are also appealing the HESS summary judgment that was granted pre-trial that was associated with several loads that were interstate loads carried by Universal for the benefit of HESS. With respect to Dalton, I'd like to start with a quote for the Court. This is a quote from the Court of Appeals in San Diego, San Diego. Reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. To hold otherwise would be to reward a party for signing a contract under false pretenses, promising to abide by the written terms while secretly intending to enforce the conflicting terms of an unwritten bargain. Counsel, how is that case helpful to us here, where the contract in that case was a binding document and the IOI letter here in the instant case expressly states it is non-binding? I think that the IOI, which is the keystone piece of evidence for Universal's position, though it mentions binding and non-binding materials, I think the totality of the document itself, when looked at, is a sufficient warning to the public that a binding agreement would be subject to a fully executed written agreement. And it warned them ahead of, though I understand that there are differences between binding and non-binding sections within, the preamble language contained within the IOI is very specific that there would be no agreements without the execution of a formal written agreement. So I don't believe that that is dispositive of the IOI. So you're saying the IOI is binding? Are you saying you understand it's not binding, but because there was going to be something binding, we're still, that case lost? There were certain terms regarding confidentiality that were specifically articulated as being binding. Right. But this is not one of those terms, is it? Regarding the written agreement, I would say that the binding section speaks specifically to sections 6, 7, 8, 9, and 10, but the preamble language to the non-binding section, which is section 10 of the IOI, specifically states that the proposal is not intended to create a legally binding offer or legally binding obligations except with respect to paragraphs 6, 7, 8, 9, and 10. Well, 9 obviously contains language suggesting that this is not intended to create a binding obligation, and that my reading, at least based on the grammatical use of the comma, is that except with respect to 6, 7, 8, 9, and 10 only applies to the binding obligations with respect to those paragraphs. It's very different than the Mercedes-Benz or the J.P. Morgan Chase case, isn't it? It is and it isn't. The interesting thing about that line of cases, Your Honor, is that the J.P. Morgan Chase case, which was subsequently followed by the Carduco case and preceded by, I believe it was the Andrews v. Bank of America case, has sort of culminated into a two-sided view of promissory, estoppel, or reliance-type damages in light of a writing. However, that is not the only, as a matter of law, determination that would avoid reliance. If you read Carduco and you read J.P. Morgan Chase v. Orca Assets, and especially this Court's subsequent ruling in the Cypress Medical Center v. Aetna case, there is an analysis that talks to reliance damages being offset as a matter of law by virtue of either a writing or red flags. Red flags, though, are a critical aspect in this particular case. As the Court is aware, these parties, Dalton Logistics and Universal, met in May of 2013, signed the IOI, which itself represents a red flag, even if not binding. I disagree with that. You're pivoting from binding and so to red flags now, right? I think for the sake of this argument, I am focusing more on the red flags because I understand the Court's consternation with the binding language of the IOI. But without conceiving that the IOI itself is not the biggest red flag of all. And so when looked at in context, we see two sophisticated parties, Universal being a publicly traded company with a duty to perform its responsibilities to its board, to its shareholders, in a responsible and formal manner. We have the IOI calling forth for formalities. And subsequent to that, we have many, many, many red flags that are very evident on the record in addition to the IOI, which include not only the initial proposed asset purchase agreement that was made no more than three months after the IOI was signed and rejected by Dalton's CEO, Dick Meredith. All we have subsequent to that are essentially communications between these sophisticated parties suggesting a need for or a desire to work together that eventually culminates in Dick Meredith, CEO of Dalton, saying, hey, Universal decided not to buy Dalton Logistics and that's okay, that's business. In the 22 months since the signing of the IOI, there's not a single document, there's not a single email, indicating that there was a promise or indicating that there was some sort of unequivocal agreement to purchase. There's a lot of evidence, though, of promises made, oral promises made. I'm sorry, Your Honor? There's a lot of evidence about oral promises and assurances that were made that the deal was still on. Yes, Your Honor. I think that the fact that there were assurances made is far from dispositive. In fact, assurances in an arm's-length transaction like this, when both parties are supposed to be looking out for their own best interests and conducting their own due diligence, simple assurances that we're going to try to get something done, that we're going to eventually make something happen, even though I don't believe any of those assurances were that concrete, are not sufficient to bond. I'm sorry, Your Honor? So you don't believe they were concrete? Does that include the May 31, 2013 oral promise meeting in Detroit? See, Your Honor, I believe the oral promise, first of all, I believe that is the only oral promise. Dick Meredith testified that that was the only one. So you believe that was there? I don't believe that was there. I don't believe there's any objective evidence that there was anything there. Dick Meredith was attended at that meeting with his counsel, who did not testify at the time of trial. There's no correspondence. There's no e-mail. There's no subsequent writing. You're saying there's no evidence in the record at all from which a jury could believe that there had been this oral promise in Detroit? I do not. There's zero evidence? I believe there is zero evidence. Okay. Did you make this argument in your 50A motion that Dalton failed to satisfy any of the elements of promissory estoppel? I believe that what was made essentially conflated the oral contract and reliance argument. So I believe it was made. I wish it was, in reviewing the record, I wish it was clear that there was a difference between the contract and the reliance. I think the focus was more on the oral contract. Does it say anything about promissory estoppel in the 50A specifically? It does say about reliance damages. Does it use the term promissory estoppel? I mean, we're not magic words. Your Honor, I understand. No, I don't believe during that period the 50A used promissory estoppel. Why shouldn't it be reviewed for plain error? Because I think under Carduco, under Aetna, and under JPMorgan Chase v. Orca, it is a matter of law finding that in light of the writing or the IOI, which could be reviewed de novo, that those prevent the submission or the consideration of that promissory estoppel cause of action as a matter of law. Well, you know, Metroplexes have some broad language saying that reasonableness of reliance goes to the jury. And then to me, I read Mercedes Benz case, there was a direct contradiction. The letter of intent or whatever they called it said exactly where the leadership would be located and that it couldn't be moved without Mercedes' express consent. And so when they moved it without that, they said there was no reasonable reliance, and that's a lot different from our case. We don't have anything in the letter of intent that says you can't rely on any future oral promises in the agreement. Well, I think that's what the IOI, the spirit and the substance of the IOI, is that Dalton should not rely on oral representations. Not to mention the IOI specifically sets out that there is no cause of action. The parties agree that there would be no cause of action if negotiations were terminated by universal. It's explicit within the IOI. But to get to your point on Metroplex, that case is distinguishable. There's not a specific writing involved in Metroplex. There was a proposal wherein the party that would service the environmental aspects of a large construction project was mentioned within a proposal as a partner, and then after that proposal fell through and then the primary on that project was subsequently reevaluated by the city and given the contract, that primary company represented to the city repeatedly that the plaintiff was going to be a partner on that project and utilize that in order to substantiate that contract. But more importantly, there was third-party evidence, objective third-party evidence, that that promise and that representation was made about that relationship. You've got a lot of issues. You better move on. Yes, Your Honor. Getting to H&P, the H&P subject is sort of bifurcated between a summary judgment motion that related to subcontracted loads, and there were also issues that were submitted to the jury on the universal loads, the universal loads being the ones that universals carried themselves. The jury found that there was no contract between universal and H&P, right? That is correct, Your Honor. And our position is that under commercial metals, those bills of lading are what they are. They are contracts as a matter of law. They are not disclaimed under Section 7, nor is there any other writing wherein H&P disclaimed. You know, I looked at those bills of lading, and they don't say how much the load weighed. They don't say how much what the dollar value is. One of them even says that it's a gate pass, and there was testimony from H&P that the only purpose, the only reason they issued these was to keep track of what left their yard. Well, wasn't that a jury question? Well, I don't see how it could be a jury question because H&P authored those supposed gate passes. They authored those bills of lading. It should be construed against H&P, and H&P utilized a standard bill of lading that's published in virtually every transport publication there is, and certainly there's no evidence that they were using it as a gate pass except for that single document where it says gate pass on it. Of the other several hundred, they are clearly being used as devices for movement of H&P's freight, which is not disclaimed by H&P. H&P admits that Universal moved those materials, and though H&P paid Dalton, Dalton never remitted that payment to Universal, and per Commercial Metals, Universal has every right to seek payment from H&P based on the bills of lading. We believe it was a contract issue that was a matter of law issue that should have been decided by the court without submission to the jury. We think that was error to submit an interpretory question to the jury regarding the content of a contract. How do we have jurisdiction over that? Regarding what, Your Honor? I'm sorry, could you clarify? The H&P issue that's not part of the notice of appeal. Well, the H&P issue was a moving target. We had a reservation within Universal's notice of appeal, believing that there probably would be amendments to the final judgments or the judgments in general. Right, you have to appeal that after those happen, don't you? You're saying you filed a premature notice of appeal that covered it, but that's not good enough, is it? We believe a premature notice of appeal moves forward, that it actually moves forward. What case says that? Lots of CLEs are given about late notices of appeal and premature notices of appeal. Yes, Your Honor, I apologize. I know that's briefed within our response to H&P's briefing, and I apologize, I'm not able to recall that case off the top of my head. All right. Why don't you touch on the district court's ruling denying Universal a right to recover from Dalton the $1.9 million? That's a little bit of a . . . Why don't you . . . this case has got a whole lot in it. We're not rushed. I'll tell you what we're going to do. Give him three minutes. I'm not sure he can do it in three. And then we'll give the other side three if you need it. We've got no empty chairs over there, so we'll see. But stay within. You spent three minutes identifying what you were going to argue, as opposed to using that three to start an argument. Yes, Your Honor. So you've got three minutes now, so go for it. Okay. With respect to the $1.9 million, that was awarded by the jury as money hadn't received by Dalton that belonged to Universal. That represents the freight charges that Dalton was paid for Universal carrying various loads. We don't see a basis for the trial court to have reallocated that $1.9 million as reliance damages, much like we don't see any evidence of the $5.7 million as being a reliance damage for Dalton in this case. There was no jury finding that the $1.9 million represented a reliance damage, nor was it requested to the jury, nor was it waived or otherwise disposed of pre-trial or pre-jury verdict. In addition, the reallocation by the trial court flies in the face of the jury's answers to questions one through four, where they specifically found that that $1.9 million being held by Dalton was not excused. Well, effectively what the court did was to reallocate that money. But the reasons the interrogatory gave were fraud reasons, not reliance reasons or anything related to what the judge decided, it seemed to me. How so, Your Honor? I'm sorry. Well, the interrogatory listed said it was excused because of and listed three or four reasons that looked like fraud reasons to me. Well, regarding false representations of material fact, that would have been question four in the jury charge. But simply put, though, there is no factual finding that the $1.9 million is a reliance damage, not to mention Dalton was paid that $1.9 million by the customers. Representative, you didn't ask for there to be a question. Well, I don't believe it's our burden. I think it's Dalton's burden to request a finding that the $1.9 million relates to a reliance damage. Well, I think that what the judge found was that if Dalton reasonably relied on the fact that the sale would have gone through, then this $1.9 million would not have been paid. That was part of the money that had been given to Dalton to maintain the business until the deal went through. With respect, Your Honor, I think the $1.9 million was specific to loads that were carried for Hess, H&P, Four Seasons, and others. And while there was credit extended. Dalton told them not to pay it, just keep the money so that they'd have more working capital. But there's repeated attempts by Universal to collect that money from Dalton as it was accruing. All right. You still have your rebuttal time, so let's back up. All right. Mr. Post. May it please the Court. Russell Post, appearing on behalf of the Appley Dalton Logistics. I want to begin this morning with the standard of review because the standard of review really forecloses virtually every argument that you have heard this morning. I've provided the Court with a bench exhibit to aid me because in preparing for the argument, I realized that the procedural defaults here were even more extreme than we identified in the brief. You have a plain error issue because the Rule 50A motion did not challenge the promissory estoppel claim at all. None of the liability elements of promissory estoppel are even referenced. And the argument that you've heard about reliance was reliance directed at the contract claim. But there's no suggestion that the liability elements of promissory estoppel were included in the 50A motion. Well, opposing counsel said they didn't have to because they think as a matter of law it's insufficient. That was what was said in response to my question. And that's not an escape from plain error, Your Honor. The argument that counsel made, and I wrote it down because I think it's significant, is that the IOI is the, quote, keystone piece of evidence. Their theory is not that there's some abstract legal principle that they could assert for the first time on appeal. Their theory is that Plaintiff's Exhibit 24, which was the IOI, conclusively disproves the elements of the promissory estoppel claim. That is plainly a matter about the sufficiency of the evidence. And so while I wouldn't agree with the premise that you could raise a purely legal issue, a matter of law issue, for the first time on appeal, you don't even have to deal with that here because this is not a purely abstract legal question. It's about the weight of the evidence. The 50A motion did not raise this issue. But significantly, Your Honor, for that purpose, neither did the 50B motion. And that's the point that I wanted to call to the Court's attention this morning. In tab A, I gave you the 50A motion, the oral 50A motion. Tab B is the motion for judgment as a matter of law after trial. I'm not going to ask the Court to study it, of course, during the course of the argument, but I will tell you, you will not find in tab B the argument about specific provisions of the IOI conclusively preventing the promissory estoppel claim. There's a fact-bound argument about weighing all the evidence, and there's a couple of references to the IOI. But the kind of legal argument that you heard this morning based on J.P. Morgan and Cardico, it's nowhere there. They tried to raise that argument. They tried to make this legal argument in a reply in support of the Rule 50B motion, and it was stricken because it was filed late and it was in violation of the Court's local rules. And if you look at tab C, you will see the order from the district court striking that reply. And so this legal argument that you've heard this morning is doubly unpreserved. It is subject to the highest form of plain error review. It will not surprise the panel to know that we have studied the panel's decisions and we can't find a single case in which any member of this panel has reversed a civil judgment for plain error. And the reason is obvious. That standard is high. Any evidence at all is sufficient to satisfy it, which means their argument about trying to use the IOI to trump the evidence and the oral promises at trial cannot satisfy plain error. And this is not a situation that could in any way impugn the integrity of the legal process to warrant a discretionary reversal. But, counsel, should we rule on the plain error standard, or should we rule that it was forfeited in the district court and then you don't go through the plain error analysis? If you were—are you arguing both to the Court or one or the other? Your Honor, I would be receptive to either disposition. I've always found it to be a theological question whether a forfeiture can foreclose even the application of plain error review. And it seems to me that the Court has cases going both ways on that issue. Theological? Theological, Your Honor. It's absolutely—maybe metaphysical is a better term. But I didn't want to weigh into that debate. We thought about making the argument that it's an outright forfeiture, but I think plain error is sufficient. Which helps as offenders, forfeiture and no plain error. That's exactly right, Your Honor. I think it's easy enough under the district plain error standard to reach that conclusion. Let me turn, if I can, to the merits of the argument, because I do want to make sure that I'm responsive to the argument that you've heard this morning, and then I'm going to speak to the question about the $1.9 million offset since Judge Davis, I think, correctly called our attention to that question. With respect to the merits, though, of the argument about the promissory estoppel claim, the Texas Supreme Court repeatedly has said whether reliance is justified is ordinarily a question of fact. It is ordinarily an issue for the trier of fact. It is only in the rare case where you have irreconcilable red flags or direct contradiction with a writing that reliance could be unjustified as a matter of law. So if you're drafting a letter of intent, you have to put in there that the buyer agrees he will not rely on or neither side will rely on future promises. That's exactly right, Your Honor. To keep it a legal question. That's exactly right. And everyone doing business in Texas has fair notice that that is the standard. The Italian cowboy decision from the Texas Supreme Court said if you wish to have a contractual disclaimer of reliance, it must be done in clear and unequivocal language. And if it is not clearly and unequivocally disclaiming reliance, then it is not effective to establish a bar to an oral representation claim. And that's the only kind of contractual provision that could be material here because a promissory estoppel claim is a claim about reliance on the promises that were made. And so the argument that you hear is largely about an effort to attack the oral contract claim that the jury didn't find, that there weren't definitive agreements, that the IOI contemplated definitive agreements. If we were here defending a judgment on a finding of an oral contract, that argument would be material. But that's not what the jury found. The jury found that there were independent representations made to induce reliance upon which Dalton detrimentally relied. And nothing in the IOI forecloses reliance on those representations. So is there evidence in the record that the May 31, 2013 meeting contained an oral promise? Is there anything in the record to support that? Yes, absolutely. There's testimony in the record that there was an agreement on May 31 to the terms of a transaction that Dalton would be purchased by Universal for a minimum of $25 million, potentially as much as $28 million, and that the parties shook on it at the end of that meeting and said, we have a deal, we're one happy family. So there's ample evidence in the record that that agreement was made. And then, as in the Metroplex case from this court, you have ongoing assurances from the president of Universal to Mr. Meredith on behalf of Dalton encouraging him to continue investing his capital in order to facilitate that acquisition. It's exactly the kind of scenario that the Texas Supreme Court in Wheeler v. White held promissory estoppel exists to rectify. And so this is a classic case of promissory estoppel. It's really a very modest remedy. And you have no direct contradiction here between any provision of the IOI and these promises. The promises that were made to Mr. Dalton, pardon me, Mr. Meredith on behalf of Dalton, were promises in furtherance of and consistent with the terms of the IOI. And far from being red flags, we were being given green lights for 18 months that this transaction is going to go forward and there's detrimental reliance and investment and reliance on those promises. What about when that $18 million counteroffer came in? Why wouldn't that have been a red flag? Well, Your Honor, it was a red flag with respect to the specific terms of the transaction that had been negotiated but not with respect to the promise to purchase. And that's the important distinction here for purposes of promissory estoppel because we're not arguing that there's reliance on the specific $25 million to $28 million terms. We're arguing there was reliance on the promise to purchase Dalton and that that is what induced Dalton to expend all of its capital and to incur this additional debt. And so all that happened when Universal tried to change the terms of the deal is Mr. Meredith knew, well, I can't rely on those specific terms anymore. But simultaneously, Mr. Cochran, the president of Universal, is saying, we are going to do the deal. We're going to acquire Dalton. Continue making your investments. And so that is the promise that induces the reliance that forms the basis of the reliance damages. It seems to me if the buyer is dropping the price, he's kind of wavering on the deal, isn't he? Well, in many cases, that might be true. Now, that's just the kind of argument that I would say is for a fact finder to weigh how reasonable the reliance is in the context, but that's not the facts here because the buyer dropped the proposed price, but at the same time, the principle negotiated for the buyer is telling Mr. Meredith, stay the course, hang in there, we're going to reach an agreement that will satisfy the money people. And if I were trying to get the price that had been agreed originally, then these red flags would be significant. But all we're asking to recover is the promissory estoppel reliance damages that we expended in reliance on those promises, and there was no change in position with respect to Universal's ongoing promises to make the acquisition. And with that context, let me turn to the issue, Judge Davis, that you raised about the $1.9 million because the reliance was not just the $5.7 million that we expended out of pocket. It was also the $1.9 million debt that we incurred to Universal. And counsel fundamentally misunderstands what happened in the district court when he says that the district court failed to award the $1.9 million. That is not the case. The district court didn't disregard the finding in favor of Universal. The district court made its own independent finding that promissory estoppel damages included the $1.9 million debt and applied an offset. And candidly, Universal has never grappled with the fact that this is an offset judgment. It is not a judgment that disregards the $1.9 million award. And so there's two key principles that I want the court to understand with respect to the $1.9 million. The first is that the parties agreed to a bench trial on this element of damages. Counsel argued that it's not their burden to ask for a jury finding on this element of damages. That is wrong legally and factually. Legally it's wrong because under Rule 49A.3, any party that does not request submission of a factual issue at the time of submission of the charge is deemed to have deferred that issue to the court. Counsel's thinking about this in terms of the Texas rules of charge practice where it's the party with the burden of proof who has that obligation. That's not true under Federal Rule 49. But second, factually, this is not a situation where they simply remain silent while we fail to ask for the question. We don't have one of those things that would create a Romero problem where the person stands moot and won't tell the judge what would be the right submission. We do not, Your Honor. Having been present in the courtroom in the Romero charge conference, I can attest this is nothing like that situation. We have a situation where Universal actively objected to the question that we tendered to secure precisely this damage finding. And the district court sustained Universal's position, did not ask the question with the understanding that the district court would be able to resolve that issue at the time of judgment. So the parties agreed to bench try that issue. And the final point that I'll make is, Judge Davis, you have it exactly right with respect to the excuse question. That question is framed in the Texas pattern jury charge as equitable estoppel. In substance, it is a fraud question. It includes elements of scienter that are not in the promissory estoppel question. And the jury here quite reasonably could find Universal's decision makers who wanted to do this deal didn't act fraudulently when they made the promises. That's not inconsistent with the district court's finding of promissory estoppel. All right. Thank you, Your Honor. Thank you, Mr. Post. Ms. Schell. Good morning. Leigh Ann Schell for Hemlick and Payne, which I'll refer to as H&P. I'll begin with the two reasons why this court should not take up Universal's challenge to the jury's decision in favor of H&P. And the first is that, Judge Elrod, you asked whether Universal's failures were jurisdictional, whether they precluded this court from actually looking at the issues raised. And with respect to H&P, I'll go beyond the theologic and say that the error here is actually jurisdictional. In the case of H&P, Universal did not make any Rule 50A motion for judgment as a matter of law at any time. So there's no Rule 50A motion. Judge Stewart, when you wrote the Feld decision for this court that talks about preserving error from the denial of summary judgment on a legal issue, you spoke in terms of jurisdiction. And you said that the failure to file a Rule 50A motion would be jurisdictional and would not give the court the authority to address the question. Also, as Judge Elrod noticed, the notice of appeal that Universal did file did not challenge the jury's verdict for H&P. It is true that in some instances a premature notice of appeal will ripen once a judgment becomes final, but that's true only for what is included in that original notice of appeal. And here Universal specified only four errors in its notice of appeal. Those do not include the jury's judgment in favor of H&P. And the second reason beyond the jurisdictional mistakes is that if this court affirms the judgment in favor of Dalton, then it will not reach the H&P question because the freight charges will be satisfied by that offset that counsel for Dalton just mentioned. But Universal got left holding the bag, didn't it? No, Your Honor. Universal is not left holding the bag. Universal, by its own deeds, made a deal with Dalton to forgive those freight charges, essentially by saying, Here, use that money to continue your business because that's what we need. But really, apart from that, and for H&P's part of the case, Judge, I'd like to go to that and say even if this court does review the errors that are alleged, the first is the error that the jury should not have found that there wasn't a contract between H&P and Universal. Besides not being preserved, that's also factually incorrect. The first question that went to the jury was a question of fact, whether or not there had been any agreement, any meetings of the minds. Judge Davis, you noted earlier that there had not been. While there were pieces of paper exchanged at the trucking yard marked bills of lading, Corey Larler testified for H&P that those pieces of paper were purchased by H&P at an office supply store, that they were model rail carrier forms. He also testified that there were duplicate bills of lading, and those were put into the record, duplicate bills of lading that listed Dalton as the shipper and thus primarily responsible. And finally, Corey Larler said that those pieces of paper functioned as gate receipts, and the jury was entitled to believe that. There's no challenge to the sufficiency of the evidence here because that wasn't preserved. So the only challenge is whether or not the jury should have been asked that question to begin with, and the jury should have been. We don't get to commercial metals here. Commercial metals only kicks in if there is a valid bill of lading, and only then commercial metals is narrow in its holding, and it says that failure to follow credit regulations alone will not be enough to trump the provisions of a bill of lading, but the court leaves open the fact that other circumstances may. This is a case where the other circumstances are such that a bill of lading was never properly formed between the parties, and for that reason, the jury's verdict should be affirmed in favor of H&P. The only other part of the H&P argument that Universal raises is whether or not the district judge, Judge Bennett, erred in granting summary judgment for H&P for the loads that Universal itself did not carry. Universal only has one argument that H&P should pay for those loads, and that argument is based on equitable subrogation. But as Judge Bennett correctly found, the doctrine of equitable subrogation cannot apply here because Universal was never primarily obligated to pay the debt. So the Frye-Marriott case is the one that's cited by both sides, and the very premise of that decision is just not met here because based on the contract between Universal and those carriers, Universal had to pay them, not H&P. So that doctrine doesn't apply. The only other argument that was made was a late-made agency argument that Judge Bennett rejected as not having been pled timely. And so the points of equitable subrogation are just not met here. So, Your Honor, if the court does reach the question raised by Universal against H&P, which we urge the court should not, at best there's a jury charge error that would give the court the right to look at plain error, whether the question was submitted or not properly to the jury. Universal hasn't even attempted to argue that there was plain error here in this case. The question presented was answered correctly. There was ample evidence in the jury, so there's no miscarriage of justice here. There was ample evidence in the record, I mean, supporting the jury's decision that there had never been a contract between Universal and H&P. Instead, as acknowledged by Dalton, Dalton was obligated to pay the freight charges to Universal directly. Thank you. Ms. Crozier. May it please the Court. My name is Christina Crozier, and I represent Hess Corporation. The portion of this appeal that's devoted to Hess is quite limited, and so my remarks here today will be brief. The district court correctly granted summary judgment in favor of Hess because there is no evidence of a contract between Hess and Universal. In its reply brief, Universal contends that bills of lading made up the contract, and to support its argument, it points to 177 different bills of lading, but it cannot point to a single bill of lading that Hess actually received or assented to. The evidence shows that those bills of lading were found in Universal's files. They were created by Universal, and they were not signed by Hess. Richard Meredith, Dalton's president, testified that there were no bills of lading at the Hess rig moves. Similarly, Joey Henderson, Hess's corporate representative, testified that there was no exchange of papers at the Hess rig moves. Universal did not present any controverting evidence on these points. In the absence of any contract between Hess and Universal, the district court correctly granted summary judgment on Universal's breach of contract claim. I'd also like to add that if this court affirms in favor of Dalton on all points, any error that the court might find in granting the summary judgment would be harmless because those amounts would have been awarded to Universal and then offset again. With that, if this court has no questions for Hess, I can get back the remainder of my time. Hess respectfully requests that the court affirm the summary judgment. Did opposing counsel argue the point with the bills of lading in the main brief? Barely. They said that Hess was subject to bills of lading. So it's arguable there that there was briefing waiver. We were not aware. But you're not urging briefing waiver? I believe it was briefing waiver. It was the first time that they said that the bills of lading created the contract in this court. And, in fact, the district court had said there was no contract, and they did not directly challenge that. Had they argued to the district court that it was that's what had created it at the time of the summary judgment? I can't remember that. They hinted at that, certainly, in the summary judgment briefing, but they did not directly say that in their appellant's brief. If the court doesn't have any further questions, I can get back my time. Thank you. Thank you. We're back to you, Mr. Novak. You've reserved your rebuttal time. I'd like to approach a couple of different things fairly quickly that I think were glossed over in my original argument. With regard to the reliance damages, I want to reiterate the lack of evidence on the record that the $5.7 million awarded to Dalton can be shown to be an out-of-pocket expenditure by Dalton in reliance on this supposed promise. I believe my opposing counsel made numerous comments about the fact that there is some nebulous promise following the execution of the May 31st IOI. It is our contention that that type of promise, if it even exists, is too nebulous, too vague, to be enforceable in any way, shape, or form, and I do not want there to be a suggestion that there was a concrete promise made after May 31st. There is no objective evidence to that end. All there is is the IOI and then, of course, the comments by Mr. Meredith, Dalton's CEO. But to the point, the $5.7 million, though shown to have been in an account prior to the May 31st, 2013 meeting and subsequently shown months or years later to have been depleted, has never been shown to have been spent specifically on anything in reliance on this particular supposed promise. Well, the damage model was, look, I had $5.7 million, and I was ready to roll it up and retire, and I was urged to stay in business and maintain the business until we could close. And then when the deal was off, my $5.7 million was gone. Why isn't that a good model? We don't know what that $5.7 million was spent on, Your Honor. We don't know if it actually is still part of Dalton's coffers or if it was just moved to some other account. There was no expert, no evidence presented at trial that the $5.7 million represents anything that was actually spent on this. There's certainly evidence in the record from Dalton about that. I don't think he testified as to what that was spent on. He testified very vaguely about needing to effectively keep the lights on. Well, he said he had to keep a staff going and he had to buy trucks, and all the money that he had in his coffers when the promise was made was spent on running the business to keep it intact. Respectfully, I think there needs to be more of a one-to-one correspondence between what was spent in order for a jury to award it as reliance damage, which brings me to my next point, which is that the August 2013 offer that was made to Dalton and rejected brings up a very important consideration, which is how could that being a red flag, how could Dalton, as a matter of law, rely on further assurances? We know that assurances alone are not sufficient to maintain a promise or to resurrect a prior promise. So even if we assume one exists, simple assurances, while two arm's-length sophisticated business people are trying to get a deal together that failed, should not be enough to substantiate a $5.7 million verdict. And I think that's consistent with ORCA, Carduco, and then as well as the Aetna case mentioned previously. With regard to the $1.9 million, I've reviewed that line of the record, and frankly I do not see how there was any acquiescence for a bench trial on that. There was some commentary regarding the court's desire to perhaps use that as a credit against anything that may have been awarded to Dalton. It was a little bit unclear, but certainly that cannot be read as an acquiescence to have the court utilize that as an additional measure of reliance damage. Did you try the case or you just have it on appeal? Just on appeal, Your Honor. So the H&P case, I want to point out that the inarguable testimony at the time of trial from Mr. Lawyer for H&P was that Universal did in fact carry these goods for H&P. That is not in denial. The bills of lading are simple contracts. They're defined within many different schedules. Now, whether or not we believe that was improper for the jury to even consider, that it should have been something that the court considered, but meetings of the mind should not have played into the issue regarding the bills of lading. And then, in addition, with regard to Hess, I don't want to let that go. One needs to look no further than the North Dakota Century Code that deals with these types of arrangements, and it actually speaks in Section 805, 8-05-02 and 8-05-03 as to a presumption of, I think I'm out of time, Your Honor, as to a presumption that the consignor and consignee are liable. The bills of lading are secondary in addition to. Okay. You said that your client didn't waive the submitting the 1.9 to the jury, but Universal specifically objected to submitting the issue to the jury at 8166-67, didn't it? I believe it was objecting in the sense that the promissory estoppel should not have been – oh, I'm sorry, that the actual figure for the money hadn't received should not have been submitted. There was concern about how that would be calculated. There was a stipulation that 1.9 represented that amount, and that all the jury would need to do would be to determine whether or not the money in that amount was had and received. But looking at that line, I don't believe that there was an agreement on a bench trial, Your Honor. Thank you. All right. Thank you, counsel. Thank you to all counsel for the briefing and the oral argument in the case. The case will be submitted, and we will get it decided. All right.